Joseph W. **DAVIS**, Respondent,

v.

**STEWART TITLE GUARANTY COMPANY**, Appellant.

No. WD 37354.

Missouri Court of Appeals, Western District.

March 17, 1987.

Sherwin L. Epstein, Brian T. Meyers, Epstein & Meyers, Kansas City, Mo., for appellant.

Stephen G. Mirakian, Koenigsdorf, Kusnetzky & Wyrsch, Kansas City, Mo., for respondent.

Before PRITCHARD, P.J.,
SHANGLER, J., and NORMILE, Special Judge.

SHANGLER, Judge.

The plaintiff Davis brought an action for the breach of a title insurance policy issued on owned property by the defendant Stewart Title Guaranty Company. A jury returned a verdict for the plaintiff and awarded $33,500 damages for the breach, $7,670 for interest, $3,500 for vexatious refusal to pay, and $16,400 for an attorney fee. The court entered judgment of $61,070 on the verdict. The defendant Title Company appeals.

The chronology of the events describes the relevant evidence and frames the issues as well.

The plaintiff Davis was a commercial printer and performed some services for Dr. Kenneth Berg, President of Christian Services, International, Inc. In payment for the work, Davis agreed to accept a promissory note for $75,000 from Christian Services secured by two parcels of real estate as collateral. One of the parcels, located at 821 Harrison, was an L-shaped vacant lot adjacent to the Covenant Baptist Church. An appraiser engaged by Davis attributed a value of $50,000 to each lot. Davis viewed the Harrison tract before he concluded the collateral agreement. He noticed that there were cars parked on the lot, but had no knowledge of any claim of easement for such a use.

On August 14, 1980, attorney Chinnery on behalf of Davis submitted an application for title insurance on the Harrison tract to Title Services, Inc., local agent for defendant Title Company. On August 19, 1980, Title Services submitted to Davis a certificate that no easement or right-of-way appeared of record as to the Harrison property. On August 26, 1980, Davis consummated the security transaction and received conveyance of the tract from Christian Services International, and on September 11, 1980, a $75,000 title insurance policy issued to Davis on the property. The policy insured any loss [up to the policy limit] by reason of any defect in title or unmarketability of title, subject to stated exclusions and exceptions. An easement on the property by Covenant Baptist Church for purposes of parking was not among the exclusions and exceptions. The policy terms gave the Title Company "the right at its own cost to institute and without delay prosecute any action or proceeding which in its opinion may be necessary or desirable to establish the title to the estate or interest as insured."

In January of 1981, Davis made overture to the Covenant Baptist Church for the sale of the Harrison tract. The attorney for the church then informed Davis that they already had the right of a use easement over 61% of the Harrison property for parking purposes, so that there was no purpose to a purchase. Chinnery promptly notified the Title Company of the right of easement asserted by the church and requested the Company to respond. These concatenated events ensued:

*February 11, 1981*
Carrender, Vice-President of Title Services, responded for the Title Company to Chinnery that its file disclosed that "a reservation for parking purposes as reserved by Temple Baptist Church was released and relinquished by subsequent deed recorded December 9, 1966." The response explained further: "subsequent conveyances of the premises merely conveyed the premises subject to the original reservation, which had by then been merged, and ... no other parking rights were reserved or granted." The response concluded that the Title Company would "stand behind [its] policy as written."

*March of 1981*
Chinnery requested the Title Company to act under the policy to cure the defect in order to enable Davis to market the property.

*March 11, 1981*
Title Company responded to Chinnery through Vice-President Flippo that it con-

tinued to insure the property "with no exception regarding possible parking lot rights," but gave no promise of action.

*March 16, 1981*

Chinnery informed the Covenant Baptist Church of the Title Company guaranty that Davis owned the Harrison property free of any reservation for parking purposes, and renewed the overture to sell the church the property. The attorney for the church, Sullivan, rejected the Title Company declaration that the Harrison property was not subject to a reservation in favor of the church for parking use.

*March 26, 1981*

Chinnery related to Flippo that attorney Sullivan rejected the Title Company opinion that the Covenant Baptist Church enjoyed no reservation of use of the lot for parking, reiterated that the uncertainty impaired its marketability, and requested "that a quiet title suit be implemented [by the Title Company] to resolve this matter."

*April 3, 1981*

Flippo responded to Chinnery that the request for a suit to quiet title was noted, but was not "called for under our policy," and agreed to refer the matter to Sam Cottingham, local counsel for Title Services.

*April 13, 1981*

Chinnery transmitted to attorney Cottingham the notice from the church as to its claim of interest in the insured property for parking purposes. Chinnery requested that Cottingham proceed with a quiet title action at his "earliest convenience."

*June 5, 1981*

Chinnery, prompted by the unrelieved inaction, wrote again to Cottingham, reiterated the antecedent sequence of events, that the uncertainty as to the validity of the claim of reservation created an impasse as to any sale of the property to the church, and urged a quiet title suit "at the earliest possible time." Cottingham responded by telephone that he had requested authority of the Title Company to bring a quiet title action

under the policy, but the Title Company specifically discountenanced that course. Cottingham suggested that Davis undertake legal recourse to cure the defect.

*July 20, 1981*

Chinnery wrote to Flippo, prompted by the death of attorney Cottingham in the Hyatt Regency collapse. Chinnery related the disclosure from Cottingham that the Title Company had not authorized suit, and the Cottingham opinion that Davis "should either be paid," or the Title Company "should take the necessary action to pursue the quiet title action."

*July 22, 1981*

Flippo responded to Chinnery with surprise since he was not aware of any such "change of attitude" by Cottingham, but promised to communicate with the Cottingham firm, and to be "in touch" "as soon as circumstances permit."

The refusal of the Title Company, after this protracted course, to take any initiative to establish full title to the tract in the insured, prompted Davis to bring an action for unlawful detainer against the Covenant Baptist Church. Chinnery requested that the Title Company participate and pay the costs, expenses and attorney fee of the suit. The request was refused. On August 31, 1981, the Associate Circuit Court of Jackson County, Judge James May, ruled in favor of the church. The court gave as reason that the church enjoyed a valid easement for parking over three of the lots of the Harrison tract. Thereupon, Davis renewed effort to induce the Title Company into action. Chinnery wrote to Flippo at the Title Company on September 1, 1981, reported that the suit in the Associate Circuit Court favored the claim of easement of the Covenant Baptist Church, and tendered any appeal or the assumption of further litigation to establish the Davis claim to the Title Company. The letter to Flippo concluded that in the absence of such an initiative: "if the full amount of the policy is not forwarded, we shall file a suit against Stewart Title Guaranty Company for the face amount of the policy plus damages and any action for vexatious de-

lay in paying the amount of the claim involved." The Title Company transmitted that letter to the Cottingham firm, and on September 16, 1981, Gibson of the firm wrote Chinnery to request ten days to review the file. On October 1, 1981, Chinnery wrote to Gibson, complained of the continued delay, and refused any longer to delay litigation for redress under the policy. The Title Company and counsel continued tacit, and on December 21, 1981, Davis sued the Title Company for vexatious refusal to pay the damages due under the policy.

Two days later, by letter of December 23, 1981, attorney Dennis of the Cottingham firm, on behalf of the Title Company informed Chinnery that an appraisal of the Davis property disclosed that—the existence of the parking reservation assumed—the value of the tract was diminished by $5,050, and tendered payment of that sum to acquit its obligation under the policy terms. Davis was offered the alternative of an action to quiet title. Davis acceded to the suit. Davis, wary of the good faith of the Title Company, refused its invitation to dismiss the suit on the policy. The quiet title action was finally brought on March 9, 1982.

The two suits—the Davis cause of action against the Title Company on the title insurance policy for vexatious refusal to pay and the suit to quiet title brought by the Title Company in the name of the insured Davis against the Covenant Baptist Church—were consolidated in the circuit court. Davis then moved to dismiss the quiet title action on the ground that the issue of title had been adjudicated in the unlawful detainer action between Davis and the Covenant Baptist Church and therefore Title Company was collaterally estopped from the relitigation of that issue. The circuit court granted the motion, and dismissed the action to quiet title. The Title Company took an appeal from that judgment of dismissal.

The suit on the title policy for vexatious refusal to pay under § 375.420 proceeded to separate trial, and the jury returned a verdict of $61,070 for Davis on the composite issues.

The appeal to us of the circuit court order to dismiss the quiet title action was then reversed on the rationale that an unlawful detainer presents only the issue of the right of possession, and not aspects of title. The judgment entered by the Associate Circuit Judge on the unlawful detainer action, therefore, did not preclude the subsequent action to quiet title as to the same claim of easement. *Davis v. Stewart Title Guaranty Company*, 695 S.W.2d 164 (Mo. App.1985). The suit, however, was never reinstituted by the Title Company.

On appeal the Title Company asserts a spate of errors, some of them redundant or virtually so. Our opinion reorders, consolidates and restates these points for response.

I

The first point poses as the essential issue—as to which all others are subordinate—that the dismissal by the circuit court of the quiet title action [on the postulate that the litigation in issue was collaterally estopped by the Associate Circuit Court adjudication against the claim of the insured Davis that the Covenant Baptist Church unlawfully detained the use of the lot] prejudiced the Title Company from the fair litigation of its liability to the insured Davis under the policy. The reversal of that circuit court judgment of dismissal notwithstanding,[1] the Title Company argues, the want of opportunity to try title not only precluded defenses under the policy, but also allowed the jury to return damages on a premise of law never adjudicated: that the Davis lot was actually encumbered by a valid reservation.

■ The cause of action the petition pleads, the jury determined, the court adjudicated, and now on appeal, is for damages for the breach of a contract obligation by an insurer to an insured under a policy of title insurance, enhanced by the penalty provisions of § 375.420 RSMo 1986. The gist of the cause of action, therefore, was

1. *Davis v. Stewart Title Guaranty Company*, 695 S.W.2d 164 (Mo.App.1985).

the breach of the contract terms by the insurer Title Company and a refusal to pay the loss—willful and without reasonable cause. *Groves v. State Farm Mutual Auto Insurance Co.*, 540 S.W.2d 39, 42[1] (Mo. banc 1976). That a litigable issue of fact or of law as to an obligation to perform under the policy subsists does not preclude the vexatious penalty where the posture of the insurer to the claim of the insured is vexatious and obdurate. *DeWitt v. American Family Mutual Insurance Company*, 667 S.W.2d 700, 710[31, 32] (Mo. banc 1984).

Indeed [as then Title Company counsel and vice-president Flippo acknowledged], two alternatives are open to the insurer under the policy when presented with a claim of an adverse interest to an insured property: (1) to pursue a quiet title action *without unreasonable delay,* or (2) to pay damages within thirty days after determination.[2] Thus, that an eventual trial would have vindicated the contention of the Title Company that the Covenant Baptist Church claim of a reservation of easement over the insured property was invalid in law, does not dispel the cause of action either as to the breach of contract or vexatious refusal to pay, where the obligation of the insurer under the policy was to act without undue delay to clear the title of the adverse claim or to pay for the value of the property lost by the encumbrance—and the insurer has performed neither.

It was on August 14, 1980 [as our narrative relates] that Davis submitted to the agent for the Title Company an application for title insurance on the Harrison property before acceptance of conveyance of the tract from Christian Services. On August 19, 1980, a record information certificate issued to Davis that the Harrison property was not subject to either an easement or right-of-way. On September 11, 1980, a

title insurance policy issued to Davis in terms of the record title certificate—that is, subject to no exception or exclusion as to any easement or right-of-way. In the course of the title search for the record information certificate, however, the examiner discovered a record document dated May 20, 1971, of a reservation for parking purposes in favor of the Covenant Baptist Church. The examiner marked the document as to be shown on the record information certificate as an exception to the coverage, but it was not shown nor excepted from coverage in the title policy. In January of 1981, the Covenant Baptist Church rebuffed the Davis suggestion that the church purchase the Harrison lot, since they already enjoyed the use of much of the land under the 1971 reservation. That claim of adverse right to the insured title was promptly reported to the Title Company. The response came from Title Services, the title examiner, that the reservation on the property for parking purposes was released by recorded deed in year 1966. That response did not disclose to Davis, however, what the Title Company also already knew—the existence of a later easement in favor of the Covenant Baptist Church by a record conveyance in year 1971. [It became the position of the Title Company in the course of the claim transaction with the insured Davis that the 1971 easement was a grant not in the chain of title, and hence not valid in law.] Davis, through counsel Chinnery, advised the Covenant Baptist Church of the Title Company guaranty that Davis, indeed, owned the tract free of reservation for parking, but the church rejected that opinion and continued the parking use.

It was then that Chinnery [for Davis] began to request, and then to insist, that the Title Company initiate a quiet title action since that cloud impaired the sale of

---

2. Policy provision 3.(c):
 The Company shall have the right at its own cost to institute and *without undue delay* prosecute any action or proceeding or to do any other act which in its opinion may be necessary or desirable to establish the title to the estate or interest as insured.... [emphasis added]

Policy provision 6.(c):
 When liability has been definitely fixed in accordance with the conditions of this policy, the loss or damage shall be payable within 30 days thereafter.

the lot to the church—"the logical purchaser of the property." A spate of like requests from Chinnery to Flippo, and then to attorneys for the Title Company, Cottingham and Gibson, ensued, in terms insistent and urgent. They commenced in February of 1981 and persisted through July of that year. The Title Company refused any initiative, however, either to clear the title or to pay Davis for any loss engendered by the encumbrance. It became clear to the Title Company by April of 1981, however, that Davis had invoked the coverage of the policy, so Flippo transmitted the file to attorney Cottingham with instructions to treat the matter as a claim. The Title Company by then—with the concurrence of counsel—had determined against the quiet title option. Flippo acknowledged his deposition testimony that the neglect to show the record reservation of 1971 as an exception on the title policy was merely a lapse of the scrivener: "I will state what I know to be a fact, that on the back of the examination sheet off of which the commitment was prepared was a paragraph for the easement and it said 'show.' Whoever typed the policy and the commitment didn't turn the page over." When the Title Company was confronted with the Davis claim of an easement shown of record but not excepted from the coverage of the policy, "there [was] an obvious desire to put the best possible light on what [was] done." Thus, Flippo for the Title Company and Carrender for Title Services—the deposition testimony continued—settled on the "reasonable interpretation that the easement had been extinguished," although no instrument of release appeared of record. The Title Company rested its refusal to act upon the quiet title action option under the policy on the validity of that "reasonable interpretation."

Thus it was that Cottingham advised Davis that the Title company elected not to bring a quiet title suit to challenge the validity of the easement, with the consequence that Davis commenced an action for unlawful detainer against the Covenant Baptist Church. The court determined that a valid reservation for parking subsisted in favor of the Covenant Baptist church and

adjudicated the issue in suit for the defendant. Chinnery, for Davis, transmitted to the Title Company the notice of the judgment and the letter of the court which explained the ground of the adjudication. That letter of September 1, 1981 from Chinnery also informed the Title Company that Davis did not intend to appeal the judgment and invited the Title Company "to take over the action on behalf of Mr. Davis to establish his claim." Chinnery then made demand for "the full amount of the policy" in the event the Title Company chose "not [to] take over the defense," and threatened a suit for vexatious refusal to pay "if the full amount of the policy [was] not forwarded." The Title Company did not respond. From that date, September 1, 1981, until December 2, 1981, the Title Company made no offer or initiative to "prosecute any action or do any other act ... to establish the title to the estate or interest as insured," nor to pay the loss or damages. Furthermore, the Title Company never gave reason to Davis or his counsel for the refusal to undertake legal action to clear the cloud on the title, or to offer to pay damages. In that interim, there were communications between Chinnery for Davis and Gibson for the Title Company, with whom the Davis claim had been placed "for disposition," but without consequence.

It was then, on December 21, 1981, that Davis brought the vexatious refusal to pay action against the Title Company under § 375.420. It was then, also, on December 23, 1981, that the Title Company first offered any redress to Davis under the policy: the sum of $5,050 as damages, or the alternative of a quiet title suit. The quiet title suit was finally filed on March 2, 1982, more than a year after Davis first made claim under the policy.

■ There was abundant evidence from which the jury could find that the Davis title was clouded by a recorded right of use for parking purposes in favor of the Covenant Baptist Church, that the Title Company had notice of the claim, but neglected either to proceed without undue delay to establish title in the insured unencumbered by the claim or to fix and pay the loss to

the insured, and that the attitude of the insurer to the claim was unreasonable, recalcitrant and vexatious. That is to say, the evidence sustains the jury verdict of breach of insurance contract and of vexatious refusal to redress the loss.

We reject the contentions of the Title Company that the exclusion of evidence that the easement claimed by the Covenant Baptist Church, although of record, was a conveyance not within the chain of title—and hence invalid—not only denied the Title Company opportunity to show by valid legal opinion that the easement did not exist [and hence that the disposition of the Title Company to the Davis claim was not vexatious], but also allowed a return of damages on the erroneous assumption of a permanent encumbrance. It is the persistent theme of this convoluted point that the Title Company was never given occasion to prove the fee title in Davis, and that absent such an adjudication that the insured land was subject to a lawful easement, Davis could not recover damages for a permanent encumbrance. That is to say: no cause of action for breach of policy terms and vexatious refusal to perform accrued to Davis until after a quiet title action adjudicated that the title was encumbered by an easement.

The complaint, however, is not justified by the trial incident to which it alludes. The Title Company neither undertook to prove that the recorded easement was invalid in law, nor was the Title Company denied opportunity to present the legal opinion that the easement was not valid, to allay vexatiousness. Flippo, by then former Vice-President of the Title Company, was called as a witness by the insured Davis. It was his testimony [already noted] that the title search disclosed the recorded easement of 1971 in favor of the Covenant Baptist Church, that the examiner marked it to be shown—and it would have been shown—but for a lapse of the typist and so the policy issued without qualification as to the estate insured. It was he, also, who testified that upon the discovery of that error in February of 1981 [after Davis gave notice of the assertion of right by the Covenant Baptist Church]

Vice-President Flippo of the Title Company and Vice-President Carrender of Title Services agreed to "put the best possible light on what [was] done," and adopted the "reasonable interpretation" that the easement had been extinguished. In the course of cross-examination, the Title Company displayed a series of deeds to the witness, presumably to establish the chain of title to the insured property and to demonstrate that the 1971 recorded easement to the Covenant Baptist Church was by a party outside that chain—and hence invalid in law.

It is the contention on appeal [and we assume, despite lack of offer of proof] that such was the purport of that span of cross-examination. It is the point of the Title Company that the evidence bore legitimately both on the proof of an unencumbered title and on the issue of vexatiousness, and hence the exclusion was error. The record of the proceedings, however, shows only the purpose to prove nonvexatious insurer conduct, and not to prove title. That is evident from the objection to the inquiry by counsel to the insured, and the statement of purpose for the inquiry in response by counsel for the insurer:

Counsel for the insured: [I]t would not be proper for the [Title Company counsel] at this point to attempt to litigate through this witness whether or not there was, in fact, a valid easement.

Counsel for the insurer: *The purpose of this is not to relitigate the question of whether or not there is a valid easement.* The purpose of this is to show that Mr. Flippo had a valid legal opinion as to why that easement did not exist and the whole issue of vexatiousness is did Mr. Flippo have a right to say that easement is not there. What is that opinion based on. [emphasis added]

The Court: I just don't think that it makes any difference what—in light of what they actually knew and what they knew were the facts on the property, that there was parking going on out there and they knew that there was this recorded easement, that they

had an obligation to do something. *Irrespective of whether or not they thought the easement was any good, they had an obligation to clear it up. Either had to clear it up or pay the man, and they had the option of one of the two, but they didn't have the option to say it's not there,* this is all a facade and what is going on out there is just—I think under their policy with the facts that—it's admitted they knew, *they had to do something, irrespective of whether they thought the easement was any good or not.* That's not a defense to the lawsuit. I'm going to sustain the motion. [emphasis added]

■ We agree with the trial court that an opinion, however "reasonable [an] interpretation" of the policy, that the easement was invalid—in the face of a record conveyance of such an estate and of an actual known use of the property adverse to the insured title—bears neither as a defense under the policy nor to mitigate the vexatious nonperformance of an insurer. It is not a defense because the obligation of the insurer under the policy is *to act without undue delay to establish the title to the estate or interest as insured,* or, alternatively, to pay the loss. It is not a mitigation because the insurer never *acted* upon the opinion. The obligation of the insurer to perform arose upon notice of the claim. The opinion of counsel for the insurer that the easement was invalid was not performance under the policy, and so that inquiry was properly rejected.[3]

The argument of the Title Company is ironic, even absurd. It is ironic that the Title Company, to prove nonvexatious performance, invokes an opinion of counsel in which it lacked sufficient confidence to act upon: that an adjudication would prove the easement invalid in law. The insurer not only withheld from the insured its discovery of the recorded easement, but early determined against a legal proceeding *to establish the title to the estate or interest as insured*—in this case, a fee simple title

free of easement or other encumbrance. The insurer stubbornly refused every request by the insured to bring an action to quiet title, despite the protestations that the subsistent cloud rendered the property unmarketable. The insurer responded, merely, with the opinion of counsel that the recorded easement was invalid and with the assurance: "we will, of course, stand behind our policy as written." Then when the insured Davis, frustrated by that persistent languor, sued to oust the Covenant Baptist Church of possession, the insurer refused the tender to participate and appeal from the adverse judgment. It was only *after* the insured sued for breach of the title policy and for insurer vexatiousness in the disposition of the claim [an elapse of more than a year from the notice of the adverse claim] that the Title Company brought its action against the Covenant Baptist Church to quiet title.

■ In these circumstances of evidence, therefore, it is absurd for the Title Company to argue that a cause of action for breach of contract and for vexatiousness does not accrue to an insured under the policy until a quiet title action has adjudicated that the title was encumbered by an easement. The insurer refers specifically to ¶ 7 of the title policy. That component provides that "[n]o claim shall arise or be maintainable under the policy" (a) if, after notice, the insurer removes the defect *within a reasonable time* or (b) in the event of litigation, until there has been a final disposition by a court of competent jurisdiction adverse to the title as insured—as provided in ¶ 3 of the policy. The insurer neither removed the defect nor was in the process of the litigation of the defect at the time Davis filed the suit on the policy—thus, neither condition limited the right of the insured to remedy under the policy. It is only an action brought, and brought *without undue delay* as cognate ¶ 3 enjoins on the insurer—and not an action unduly deferred—which constitutes performance under the policy, and hence precludes the insured from suit. It is also an action

---

**3.** In fact, the opinion of Title Company former Vice-President Flippo that the recorded easement was invalid in law recurs repeatedly throughout his testimony.

brought *without undue delay* which proves a nonvexatious response by the insurer to the claim of the insured. The insurer neither brought a suit to establish an unencumbered title nor offered to pay damages until *after* the insured sued for vexatious nonperformance. We reject the *reductio ad absurdum* the insurer argues—that a cause of action to enforce the policy does not accrue to an insured until an adjudication of encumbrance, even where the insurer has determined not to institute such an action.

## II

The next point alleges that it was error for the trial court to receive as evidence Exhibit 13, the transcript of judgment in the unlawful detainer case with the letter of transmittal from the court of rendition. The transcript of judgment recited the history of the unlawful detainer action brought by the insured Davis against the Covenant Baptist Church, and an adjudication on August 31, 1981, in favor of the church and against Davis. The letter of transmittal was the recitation by Associate Circuit Judge May of the evidence in resume, and the grounds of law on which the judgment for the defendant church was entered. The Title Company acknowledges that "[t]he admission of Judge May's order for possession, standing alone, was not error as it was notice of the unmarketability of the Davis property." The insurer argues, however, that the letter of transmittal appended to the transcript of judgment "had absolutely no relevance to the issue of notice," but rather was an expression of an adjudication beyond the jurisdiction of the associate circuit court—the validity of the easement—and so was error.

■ There is no doubt that "[t]he merits of the title shall in nowise be inquired into" on a complaint of unlawful detainer. § 534.210, RSMo 1986. A cause of action under the distinctive statute protects peaceful possession of premises against unlawful dispossession and detainer. *Goerges v. Hufschmidt,* 44 Mo. 179 (1869). It is the purpose of the statute to preserve the peace and to prevent a person not in possession of premises from resort to physical force to regain possession, whatever the right of title. *Redman v. Perkins,* 122 Mo.App. 164, 98 S.W. 1097, 1098 (1906). Thus, a person with superior title may not, by that assertion, dispossess one in peaceable possession, but is left to the "ample means for enforc[ement]" the law provides. *Beeler v. Cardwell,* 33 Mo. 84, 86 (1862). That is only to say, however, that "title may not be tried out as a determinative factor." *Hafner Mfg. Co. v. City of St. Louis,* 262 Mo. 621, 172 S.W. 28, 31[1, 2] (1914). Inquiry into title is relevant to show the nature of the possession, therefore, but not to fix title. *Moore v. Shoup,* 123 Mo.App. 409, 100 S.W. 53 (1907). A plaintiff in such an action, accordingly may exhibit an instrument of title [such as a deed or easement] as an incident of the proof of unlawful detainer—not to establish a superior title, but a prior peaceable possession. *Arzberger v. Grant,* 500 S.W.2d 23, 26[1–2] (Mo.App.1973). A defendant, by the same prerogative, may show the character of its possession. *Hafner Mfg. Co. v. City of St. Louis,* 172 S.W. at 31.

■ The court letter appended to the unlawful detainer judgment recapitulates the evidence and the ground of judgment in favor of the defendant Covenant Baptist Church. The evidence, as described, was the deed from Christian Services to Davis [on behalf of the plaintiff] and a series of eight deeds which described a chain of conveyances affecting the easement under which the church claimed possession. The appendage explained that the court found for the defendant church and against the claim of plaintiff Davis for unlawful detainer on the basis of these exhibits. There is no indication that the deeds were considered by the court for any purpose other than to prove the claim of each to the prior peaceable possession of the premises. The judgment does not fix title, nor "inquire into the merits of the title," nor express any such purpose of adjudication. The jury was not misled to believe that the judgment to deny unlawful detainer to the plaintiff Davis was a determination that

the easement was a superior title to the Davis claim under the conveyance from Christian Services. The letter of appendage was relevant and material, as was the judgment proper, to prove notice to the Title Company that—in addition to a possible actual defect in the Davis title as insured—there was a manifest defect in its marketability.

## III

Another recurrent theme the Title Company asserts on appeal is that the issue of damages was not submissible, either for breach of the title policy or for vexatiousness under the statutes.

The argument percurs that no damages accrued under the policy in the absence of a permanent encumbrance, that no permanent encumbrance was proven, and so the award of damages was without basis as a policy obligation. That contention is merely a reversion to an argument already considered and rejected: that only an actual adjudication that the easement was valid and hence that the ensured estate was encumbered, would prove a permanent defect of title, and so require the insurer to pay damages under the terms of the policy. The insurer, as we conclude, determined not to adjudicate the validity of the easement and hence, even were such a judgment condition precedent for the accrual of damages, it was a condition for performance the insurer relinquished.

 The argument that damages do not accrue under the title policy as issued in the absence of a permanent encumbrance proven—that is, of a defect in title—is mistaken for a more fundamental reason. The policy insured against loss or damage not only by reason of defect in title, but also defect in the marketability of title. In law, a title is either good or bad, but in equity a title may be unmarketable

even though in fact it is good. *Kent v. Allen*, 24 Mo. 98, 106 (1856); *J & S Building Co., Inc. v. Columbian Title & Trust Company*, 1 Kan.App.2d 228, 563 P.2d 1086, 1095[11] (1977). A marketable title is one which not only enables the holder to hold the land, but to hold it in peace, and if there is a wish to sell, " 'to be reasonably sure that no flaw or doubt will come up to disturb its marketable value.' " *McConnell v. Deal*, 296 Mo. 275, 246 S.W. 594, 598[5] (banc 1922). A title which is doubtful and suggests the need of litigation to perfect it—so that an informed and prudent person otherwise willing to pay full value will not undertake to purchase—is not marketable. *Patzman v. Howey*, 340 Mo. 11, 100 S.W.2d 851, 857[8, 9] (1936). The recorded easement for parking in favor of the Covenant Baptist Church rendered the fee title of Davis to the premises at least doubtful. The Title Company acknowledges, moreover, that the judgment that the church possession of the property under the easement was not an unlawful detainer "was notice of the unmarketability of the Davis property." The Title Company even acknowledges [disarmingly, if belatedly] that "the proof the easement was in fact invalid was not the sole determinant of the issue of whether [it] was liable for breach of contract." The Title Company argues nevertheless that the marketability was a curable defect, and hence not a permanent damage.[4]

That argument garbles the option an insurer enjoys under the policy to clear the defect *without undue delay or to pay the loss* with the nonoption not to act at all. The argument also remains stubbornly indifferent to the undoubted proof that the insurer chose not to act *without undue delay* to establish the title to the estate as insured, and chose not to pay the loss. The obligation to determine and pay the loss

---

4. The issue of damages was submitted by modification of MAI 9.02 [Damages-Eminent Domain-Part of Property Taken] and MAI 16.02 [Fair Market Value] and directed an award in a sum the jury found to be "the difference between the fair market value of Plaintiff's property unencumbered by the recorded right to use the property for parking mentioned in the evidence and the value of Plaintiff's remaining property as encumbered by the recorded right to use the property for parking mentioned in the evidence which difference in value is the direct result of the recorded parking right for which Covenant Baptist Church may use the property...."

arises under the policy within thirty days after "liability has been definitely fixed in accordance with the conditions of this policy." The usual means to *definitely fix liability,* or to dispel it, as to a claim of record adverse to the insured estate is by a suit to quiet title adjudicated to judgment. The insurer learned of the claim of easement by the Covenant Baptist Church in January of 1981, and that such a record actually existed [but was mistakenly not shown on the title policy] in February of 1981, but determined then "to put the best possible light" on the lapse and to forgo the option to clear the record by a quiet title action. The insurer steadfastly reaffirmed that relinquishment of contract option, and even refused to litigate further an adverse judgment of unlawful detainer which determined that Covenant Baptist Church was in peaceful possession of 61% of the insured property for parking purposes. That judgment, final and unchallenged, stands. It confirms the doubt raised by the recorded easement that Davis has a fee simple title to convey, and suggests the need of litigation to invalidate the recorded easement, and so to perfect title. *McConnell v. Deal,* 246 S.W. at 598[5]. In a word, the unlawful detainer judgment of August 31, 1981, confirmed the title insured as unmarketable. It is an adjudication which can be superseded only by a trial of title—the adjudication of the invalidity of the recorded easement. It is an initiative the Title Company steadfastly refused, even after the unlawful detainer judgment. The *liability of the insurer was definitely fixed* under the terms of the policy by the relinquishment by the insurer of the option under the policy to act by suit to quiet title to a recorded easement adverse to the estate as insured, even after the judgment of unlawful detainer virtually confirmed the unmarketability of the insured title. The payment of loss was due, under the policy, "within 30 days thereafter."

What was left at the time the suit for vexatious refusal was brought [December 21, 1981] was the alternative obligation under the policy: to pay the loss or damage from the defect in marketability from the recorded easement. That issue of contract breach was properly submitted by Instruction No. 5 [MAI 26.02].[5] Nor does the lack of remonstrance by the insured Davis to the quiet title action brought by the Title Company after the institution of the vexatious refusal suit amount to a waiver of any undue delay in that option for performance under the policy. The insured owed the insurer "all reasonable aid" in a prosecution under its terms by the Title Company.

If the insurer means, by its intricate argument, that the submission and return of verdict—adjudicated encumbrance or not—for permanent damages was without evidence for support, it is mistaken. The appraisal of expert Vanice attributed the fair market value of the unencumbered Davis property at $50,000, and as encumbered by the easement of record, $16,500—a loss of $33,500. The expert for the Title Company appraised the fair market value of the unencumbered Davis property at $45,000—and would not cavil at a $50,000 valuation. A response to interrogatory by the Title Company gave $15,150 as the fair market value of the property as encumbered. The submission and return of permanent damages for $33,500 rest on substantial evidence.

The Title Company complains also that the court erred in the submission of vexatious damages to the jury because there was evidence that the Davis claim was "based upon a false representation of [his] loss." The title policy issued in the face amount of $75,000 and was payable according to actual loss, but not to exceed the $75,000 limit. After the adverse judg-

---

5. Instruction No. 5:
 Your verdict must be for the plaintiff on his claim against defendant for breach of the title insurance policy if you believe:
 First, prior to December 21, 1981, defendant did not pay plaintiff on his claim for the loss insured against resulting from the existence of the recorded right to use the property for parking mentioned in the evidence, and
 Second, because of such failure, defendant's contract obligations were not performed, and
 Third, plaintiff was thereby damaged.

ment in the unlawful detainer case, counsel for Davis wrote to the Title Company to invite the insurer to take over the litigation for appeal. The letter advised that in the event the Title Company was not disposed to litigate further, and since Davis had exhausted every remedy, Davis expected to have forwarded "the full amount of the policy," otherwise suit for vexatious delay would ensue. The Title Company made no response, except to request time to review the file. The Title Company is quick to say that it does not argue that "the fraudulent demand for $75,000 voided or violated the policy," but only that "the insurer had reasonable cause to reject" that demand. It was not a simple demand for the policy limit, the insurer argues, but a demand based upon the representation that $75,000 was the actual loss. The insurer alludes to the testimony by its attorney Dennis that Chinnery had communicated to him that Davis had purchased the property for $75,-000 and had contracted to sell for that sum to the Covenant Baptist Church, but that the transaction aborted when the church learned they already had lawful use of much of the property under the parking reservation. The Title Company alludes also to the testimony of Pastor Rickard of the Covenant Baptist Church that he could not remember "seeing anything like that" [a contract] to establish that the representation by Chinnery for Davis was fraudulent. It does not have that effect. It was for the jury to determine from all the circumstances in evidence whether the insurer attitude towards the Davis claim was so recalcitrant, indifferent or otherwise unreasonable as to be vexatious. *DeWitt v. American Family Mutual Insurance Company*, 667 S.W.2d at 710[31, 32]. It was the obligation of the Title Company under the policy to act without undue delay to clear the estate as insured from any claim of adverse title, or to pay the loss within 30 days after liability was definitely fixed. The insurer relinquished the option to clear the title, the liability for defect in marketability was fixed, and the initiative to pay was on the insurer. That initiative was never taken until *after* the claim of vexatiousness was brought. The amount of the demand by the insured was only one circumstance in the litigation of the suit. An exaggerated demand, if so, under the evidence here did not dispel the obligation of the insurer to act by *some* performance or the issue of vexatiousness.

The next argument relates to the award of legal fees. The jury returned $16,400 for professional services rendered by the Davis attorneys during the more than four years of claim and litigation with the Title Company. In that course, Davis had the services of two sets of attorneys. Chinnery testified, and Davis corroborated, that Davis had paid Chinnery $5,300 for his professional work on the claim, which included the unlawful detainer litigation. Those services, Chinnery testified, were necessary, and the charges reasonable. Davis then gave testimony of additional costs incurred with present trial counsel in the prosecution of the claim, and testified from a written "Attorney Fee/Expense Summary," which listed the items of charge. The total charge for services was shown as $12,911.00 and for expenses as $2,694.40, for a total of $15,605.40 incurred in addition. The *expense* component, as Davis explained, was for the cost of expert testimony—and was withdrawn from the jury on motion of the Title Company.

Davis explained that the "Attorney Fee/Expense Summary" was prepared in conjunction with present trial counsel from the time slips kept on the file. The time slips, Davis explained, reflected the actual fees and expenses incurred for those services, and periodically billed to Davis by the law firm, on the case. Davis verified that the summary accurately and correctly reflected the source records. The Title Company objected that the actual bills, and not the summary, was the best evidence. Counsel for Davis informed the court and adversary counsel that the original billings as entered on the books and records of the law firm were voluminous, but that photocopies of each billing were at hand—available for Title Company counsel—and that the summary was prepared from the printout of the entries. The Title Company objected nevertheless that "the best evi-

dence of what he has been billed are the bills themselves."

■■■■ The best evidence rule does not appertain, and for two reasons. The contents of the summary were not in issue, but only what the legal charges were. The fact to be proven—the legal charges—was a fact independent of any writing. In such a case, the oral testimony of witness Davis as to the charges made, received, and paid, was primary evidence of that fact. The best evidence rule does not apply to oral testimony of a fact. *Aviation Enterprises, Inc. v. Cline*, 395 S.W.2d 306, 308[5, 6] (Mo.App.1965). Where the writing is a summary of voluminous records and the records are before the court, and are competent and available to the other party for cross-examination—as in this case—the admission of the summary prepared by the witness in conjunction with a manager of the records, is not hindered by the best evidence rule. *Chicago & Northwestern Transportation Company v. Barclay-Moore Company*, 688 S.W.2d 805, 808[2] (Mo.App.1985). The Title Company was not, in any event, prejudiced by any imperfection in the proof of the fee by the summary because the oral proof sufficed to establish the fact. The award for the attorney fee was on substantial evidence and within the range of the proof.

■■■■ The Title Company complains of error in the instructions. We have determined that Instruction No. 5 [*see n. 5*] properly formulates the cause of action that the Title Company breached the policy by failure to pay Davis before December 21, 1981 [the date the suit for vexatious delay was filed] on his claim for loss insured against from the existence of the recorded right to use the property for parking in favor of the Covenant Baptist Church. We determined that under the conclusive evidence the Title Company on February 11, 1981 relinquished the policy option to act to invalidate the recorded easement, and so to establish the title to the estate as insured. We determined also that the insurer thereby fixed its liability for the loss, and the damage was payable within thirty days thereafter. Thus, the theory Instruction No. 5 submits rests on substantial evidence.

■■■■ The issue of damages was submitted by Instruction No. 6 [*see n. 4*], a combined eminent domain partial taking form [MAI 9.02] and fair market definition form [MAI 16.02]. In a taking by eminent domain, damages issue as of course, so the introduction *if you find in favor of the plaintiff* has no function. In the adaptation of MAI 9.02 to the submission for the damages for the breach of the title policy, the plaintiff omitted the *if you find in favor of the plaintiff* preface. The Title Company contends that oversight was prejudicial error. That neglect, although technical error, could not have misled the jury. Instruction No. 5 already directed the jury to find for plaintiff if they found that the claim for the loss resulting from the existence of the easement was not paid, and that plaintiff was thereby damaged. Instruction No. 6 merely directs the jury to determine the damage, if any, and return the award. The evidence agreed that the record of an easement diminished the fair market value of the land. The only issue was the extent of that diminution. Thus, the evidence agreed that Davis was damaged. The two instructions Nos. 5 and 6, read conjointly, instruct that the jury must find the plaintiff was damaged before damages could be awarded.[6] There was no issue of resultant damage, and hence the neglect of the *if you find in favor of the plaintiff* prelude added no undue burden on the defendant or a diminished burden on the plaintiff. There was no error prejudicial to the defendant. *Yoos v. Jewish Hospital of St. Louis*, 645 S.W.2d 177, 189[12] (Mo.App.1982); *Keifer v. St. Jude's Children's Research Hospital*, 654 S.W.2d 236, 238[5] (Mo.App.1983).

**6.** It is replete from the closing arguments of counsel that the litigants, as well as the jury, understood that damages could not be returned under Instruction No. 6 unless the jury first found under Instruction No. 5 that the Title Company was obligated under the policy to pay Davis before December 21, 1981 [the date of the vexatious refusal suit], that the Title Company did not pay and thereby breached the contract, and that Davis was thereby damaged.

The Title Company contends, nevertheless, that the direction of Instruction No. 6 that the jury return any award of damages with interest was error. The insurer argues that the damages were in dispute, and hence unliquidated and not capable of ready ascertainment—and thus not amenable to prejudgment interest.[7] The insurer cites *Fohn v. Title Insurance Corporation of St. Louis*, 529 S.W.2d 1 (Mo. banc 1975), in support.

*Fohn* was a claim under a title insurance policy. The insureds held under a warranty deed. The policy insured against loss or damage by reason of defect in title. After the policy was issued, the insureds were notified of an adverse claim to a portion of the property described in the warranty deed and in the title policy. The claimants sued to enjoin the insureds from the use of the property, and the insureds notified the Title Company of the suit against them and requested the insurer to appear and defend. The Title Company made no response, so the insureds engaged counsel, defended and lost. They were perpetually enjoined from the assertion of any right, title or interest in the disputed land. The insureds thereupon sued the Title Company for vexatious refusal to perform the policy obligations. One issue in contention was the measure of damages. The trial court submitted a modification of MAI 9.02—the eminent domain partial taking form. *Fohn* approved that form of submission, and hence settled that question of first impression under a policy of title insurance. Another issue in contention was the award of prejudgment interest. The court disallowed the award for prejudgment interest on the rationale [at 5[7, 8]]:

> [W]here the person liable does not know the amount he owes he should not be considered in default because of failure to pay.

*Fohn*—and the subject of prejudgment interest—were reexamined by our Supreme Court en banc in *Catron v. Columbia Mutual Insurance Company*, 723 S.W.2d 5 (Mo. banc 1987). *Catron* involved a claim for windstorm damage to property under a policy issued by a farmer's mutual insurance company, expressly exempted from the operation of the vexatious delay statute. § 380.800, RSMo 1978. *Catron* confirms that as a general rule interest is not recoverable on an unliquidated demand—a general rule, however, subject "to various interpretations and exceptions." *Fohn*, the opinion notes, "did not eliminate the interpretations and exceptions," but refused prejudgment interest because the claim "did not fall within any exception to the rule." *Fohn*, rather, was called upon to decide a matter of first impression—"what standard to apply in determining damages in that type of case." [*Catron*, at 7]

The award of prejudgment interest subserves two policies: to compensate for the true cost of the money damages incurred, and where liability and the damages are fairly certain, to promote settlement and to deter unfair benefit from the delay of litigation. It is these considerations, pragmatic and equitable, which govern the application of the rule. [*Id.* at 7, concurrence of Robertson, J., at 6] These considerations both operate to favor the award of prejudgment interest to the insured Davis. There is no issue of first impression, as in *Fohn*, to render the measure of damages or the means for the proof uncertain. Nor is there an issue of insurer liability, since that was already fixed by the relinquishment of the policy option to establish the title as insured. There was left only for the insurer to pay the loss or

---

7. The argument is—*simpliciter*—that the damages award was not amenable to prejudgment interest. Instruction No. 6, however, not only directs prejudgment interest, but that the interest run on the award at 9% "from February 11, 1981." The Title Company does not complain of that accrual date, but only that *any* prejudgment interest, was not proper. Our decision holds that on February 11, 1981, the Title Company relinquished the option to perform under the policy by a quiet title action or other such initiative, and that the insurer thereby definitely fixed its liability to pay the loss or damage. The time for that performance did not expire until 30 days after February 11, 1981, and any prejudgment interest would not accrue until then. *Reliance Ins. Co. of Pennsylvania v. Community Federal Savings & Loan Association*, 440 S.W.2d 929, 931[3] (Mo.1969). The insurer, however, does not contend any such error.

damage within thirty days thereafter. The pragmatic and equitable premises of prejudgment interest, therefore, sustain such an award under the evidence.

■ The very contract terms of the insurance policy, moreover, imposed on the insurer—once liability was definitely fixed—the initiative of performance to pay the loss. Here, the insurer tendered no offer at all until *after* the suit for vexatiousness was brought, and then for $5050, a sum much less than the diminution in the value of the property its own evidence established at the trial. Liability under a policy once established does not preclude the award of prejudgment interest merely because the estimates of loss may differ. *Catron*, at 7. There was no presuit tender, and hence no occasion for a dispute as to actual loss. The award of prejudgment interest was proper.

The Title Company complains also that the form of verdict was improper and that the error was compounded when the trial court read the form to the jury with the instructions. Forms of verdict are not instructions—nor may a court read them to a jury. Notes on Use, Forms of Verdict MAI 36.01 through 36.19. There was no objection to the oral rendition to the jury by the court, however, and no error as to that conduct is preserved.

The form designated for a submission of a claim against an insurance company for benefits, interest, vexatious refusal penalty, and attorney fees is MAI 36.10, formulated in these terms:

VERDICT \_\_\_\_\_ .

Note: Complete this form by writing in the name required by your verdict.

On the claim of plaintiff (*state the name*) for insurance benefits, interest, penalties and attorney fees [2] against defendant, we, the undersigned jurors, find in favor of:

_____

(Plaintiff (state the name)) or (Defendant (state the name))

Note: Complete the following paragraph only if your verdict is in favor of plaintiff (*state the name*).

We, the undersigned jurors, assess the damages of plaintiff (*state the name*) as follows:

On the policy $\_\_\_\_\_ (*stating the amount*).

For interest $\_\_\_\_\_ (*stating the amount or, if none, write the word, "none"*).

For penalty $\_\_\_\_\_ (*stating the amount or, if none, write the word, "none"*).

For attorney fees $\_\_\_\_\_ (*stating the amount or, if none, write the word "none"*).

Note: All jurors who agree to the above findings must sign below.

The form of verdict devised by the plaintiff and submitted to the jury, however, was this modification of MAI 36.10:

VERDICT _____

NOTE: Complete this form by writing in the name required by your verdict.

On the claim of Plaintiff, Joseph Davis, for breach of the title insurance policy against Defendant, Stewart Title Guaranty Company, we, the undersigned jurors, find in favor of:

_____ or _____
(Plaintiff, Joseph Davis) (Defendant, Stewart Title Guaranty
 Company)

NOTE: Complete the following paragraph only if the above finding is in favor of Plaintiff, Joseph Davis.

We, the undersigned jurors assess the damages of Plaintiff, Joseph Davis, as follows:

On the policy $_____ (stating the amount).

For interest $_____ (stating the amount or, if none, write the word "none").

NOTE: Complete this form if you find for Joseph Davis on his claim for penalties and attorneys' fees against Stewart Title Guaranty Company because of its wrongful refusal to pay the loss insured against:

For penalty $_____ (stating the amount or, if none, write in the word "none").

For attorneys' fee $_____ (stating the amount or, if none, write in the word "none").

NOTE: All jurors who agree to the above findings must sign below:

_____ _____

_____ _____

_____ _____

_____ _____

_____ _____

M.A.I. 36.10 and 36.11
Submitted by Plaintiff _____

It is the conception of the plaintiff that MAI 36.10 unmodified requires the jury to return a verdict—if found—for vexatious breach only, but does not allow for nonvexatious breach, and hence deprives the plaintiff of a return of damages should the jury find nonvexatious, but not vexatious, breach. To interstice that void in MAI 36.10, as perceived, the form as devised submitted to the jury a bifurcated verdict: First, "on the claim for the breach of the title insurance policy"; second and sepa-

rately, "on the claim for penalties and attorneys' fees against Stewart Title Guaranty Company because of its wrongful refusal to pay the loss insured against." In short, the verdict form as submitted coincided with the MAI 36.10 model except for the bifurcation into a finding on the breach of the title insurance policy and a finding on the wrongful refusal to pay the loss insured against.

The Title Company argues that the MAI 36.10 formulates the plenary vexatious refusal form of verdict and requires no modification, and, moreover, that the intersticed language in the modification—*because of the wrongful refusal to pay the loss insured against*—assumes a disputed fact and is otherwise inflammatory.

The plaintiff misunderstands the function of a form of verdict and its interrelation with the instructions of the court. Instructions inform the jury of the law and what their decision must be, based on that law. MAI, General Approach, p. XXXV, Third Ed. 1981. That is to say: instructions are the guide to a proper verdict. *Dorrin v. Union Electric Co.*, 581 S.W.2d 852, 860[11–12] (Mo.App.1979). A form of verdict, however, is not an instruction. A verdict is the decision rendered by the jury under the instructions of the court. In a suit for damages, it is the decision of the jury as to which side wins, and how much. Black's Law Dictionary, p. 1398, (Fifth ed. 1979). A form of verdict is the medium to record the decision of the jury. It is not the device, therefore, to *find* breach of performance, vexatious delay, damages—or any other issue. Those are subjects of *instruction*, and not of verdict or form of verdict. It is the device to record the decision on the case for the plaintiff or the defendant, and if for plaintiff, to record the *assessment* of damages. And, in fact, the breach of insurance contract was submitted by Instruction No. 5, the damages by Instruction No. 6, and the vexatiousness and penalty for vexatiousness found by Instruction No. 7.

MAI 36.10 as formulated, contrary to the contention of the plaintiff, allows the jury alternative to find for nonvexatious breach only, and so needed no modification to accomplish the option. A verdict for the plaintiff under MAI 36.10 *must* return an assessment of damages *on the policy* [that is, for the breach], but may or may not return an assessment of damages for penalty or attorney fees [that is, for vexatiousness], even though the verdict is rendered for the plaintiff.

The modification of MAI 36.10, therefore, was irregular. It was not an instruction, however, but just another trial event. A challenge to the propriety of the form of verdict, therefore, was due and preserved only by a contemporaneous objection. It could not be deferred, as in the cases of instruction, until the motion for new trial. Rule 70.03. The Title Company made no such objection at the trial, and the challenge was not preserved for review. Nor was the deviation a matter of plain error—as the insistence of the argument appears to pose. It merely embellished the form of verdict in a manner consistent with the instructions on the case. It introduced unnecessary, but harmless, verbiage and could not have impaired its function as the record of the true verdict. *Salsberry v. Archibald Plumbing and Heating Company*, 587 S.W.2d 907, 916[15] (Mo.App. 1979). Nor does the language intersticed in the modification—*because of the wrongful refusal to pay the loss insured against*—either assume a disputed fact or inflame. The terminology attempts the equivalent of the vexatiousness submission, and clearly refers to assessment of damage as to issues already found under the instruction on vexatiousness. The term *wrongful* [to mean *without reasonable cause or excuse*] may be inept within the context of the instructions as given—but caused no manifest injustice to the Title Company.

IV.

The Title Company contends a miscellany of other trial errors. These restate and reargue points already addressed and premises already rejected. The award of

damages was within the evidence, and each component rests on substantial evidence.

The judgment is affirmed.

All concur.