2015 OK CIV APP 49

**OPY I, L.L.C., Plaintiff/Appellant,**

v.

**FIRST AMERICAN TITLE INSURANCE COMPANY, INC., Defendant/Third–Party Plaintiff/Appellee,**

v.

**Orhan Yavuz and 61 MM, Ltd., Third–Party Defendants.**

**No. 112,098.**

Court of Civil Appeals of Oklahoma, Division No. 3.

Dec. 19, 2014.

Certiorari Denied April 27, 2015.

Kort A. BeSore, Tulsa, Oklahoma, for Plaintiff/Appellant.

Mark W. Kuehling, Charles B. Sexson, Oklahoma City, Oklahoma, for Defendant/Appellee.

BAY MITCHELL, Judge.

¶ 1 This case arises out of a title insurance coverage dispute between Plaintiff/Appellant OPY I, L.L.C. ("Plaintiff") and Defendant/Appellee First American Title Insurance Company, Inc. ("Defendant"). Plaintiff, an Oklahoma limited liability company, appeals from summary judgment granted in Defendant's favor.

¶ 2 On August 28, 2003 Plaintiff entered into a contract with Third–Party Defendant 61 MM, Ltd. ("Seller") for the purchase of a vacant commercial lot located in Tulsa, Oklahoma ("subject property"). At the time, Seller was being sued by one of its investors, Third–Party Defendant Orhan Yavuz ("Yavuz") in federal court.[1] Related to this litigation, Yavuz filed two *lis pendens* notices against the subject property in Tulsa County. Defendant issued a title insurance commit-

---

1. Yavuz originally filed suit against Seller and other defendants in the District Court of Tulsa County, but the matter was later removed to the U.S. District Court for the Northern District of Oklahoma. Among several causes of action, Yavuz, who is a citizen of Turkey, claimed Seller defrauded him of money used to purchase real property in Tulsa. Yavuz claimed to have a constructive trust against property owned by Seller, including the subject property. The Northern District originally dismissed the suit based on *forum non conveniens,* but the Tenth Circuit reversed and remanded the matter back to the Northern District for further litigation on the issues surrounding the *forum non conveniens* ruling. The Northern District again dismissed Yavuz's suit based on *forum non conveniens* concluding Switzerland was a more appropriate jurisdiction for the litigation. The Tenth Circuit ultimately agreed and also found, despite Yavuz's artful pleading, he had no claim on the real property owned by Seller. Yavuz's claims sounded in contract and tort and arose out of his business relationship with Seller. Additionally, none of the written agreements between Yavuz and Seller granted Yavuz any interest in real property owned by Seller.

ment which described the Yavuz litigation and required the expungement of the *lis pendens* notices as a condition precedent to issuing title insurance on the subject property. Prior to the closing, the *lis pendens* notices were expunged.

¶ 3 On December 5, 2003, Defendant closed on a contract to purchase the subject property. Plaintiff purchased title insurance from Defendant which provided Defendant "insures ... against loss or damage ... sustained or incurred by the insured by reason of ... [a]ny defect in or lien or encumbrance on the title ... [or] [u]nmarketability of the title...." Both Plaintiff and Defendant knew of the existence of the Yavuz litigation and the expunged *lis pendens* notices. Neither the Yavuz litigation nor the *lis pendens* notices were ultimately listed as exceptions on the title insurance policy.

¶ 4 After its purchase of the subject property, Plaintiff sought to secure a construction loan to build commercial office space. Plaintiff claimed it had signed a contract with a tenant who agreed to a five (5) year lease at $60,000 per year. However, Plaintiff alleged its chosen lender, Spirit Bank, refused to fund a construction loan for Plaintiff causing the tenant to withdraw from its rental agreement. Plaintiff claimed this was due to the uncertainty in its title generated by the 'Yavuz litigation and demanded Defendant either intervene in the suit to assert Plaintiff's title or file a separate quiet title action. Defendant did not intervene in the Yavuz litigation nor did it file a quiet title action at that time. The dispute between Plaintiff and Defendant continued informally for some time, ultimately resulting in Plaintiff filing this case in October 2007 against Defendant for breach of contract and for breach of the implied covenant of good faith and fair dealing. Included with its answer to Plaintiff's Petition, Defendant filed a third-party petition against Yavuz and 61 MM, LTD seeking

to quiet title to the subject property in Plaintiff's name.[2]

¶ 5 After the trial court denied its initial motion for summary judgment against Defendant, Plaintiff filed a second motion for partial summary judgment against Defendant asking the trial court to determine whether, as a matter of law, a particular provision of the title insurance policy, specifically paragraph 4(b), imposed an affirmative duty on Defendant to confirm Plaintiff's title or whether it merely granted Defendant the option to confirm Plaintiff's title. Defendant had previously filed its own. motion for partial summary judgment against Plaintiff which was still pending at that time. Defendant's motion argued that Plaintiff did not have a valid claim under the title insurance policy. Defendant maintained it did not have a duty to defend Plaintiff in the Yavuz litigation because Defendant was not a party and because the orders expunging the *lis pendens* notices eliminated any right, title, or interest Yavuz may have claimed in the subject property. Defendant also argued the title insurance policy did not require it to take affirmative action to confirm Plaintiff's title by intervening in the Yavuz litigation or filing a separate quiet title action. The trial court denied Plaintiff's motion but granted Defendant's motion finding Defendant did not breach the title insurance policy. Specifically, the trial court stated:

> The orders expunging and discharging the two *lis pendens* terminated any right, title, claim, lien or interest of Mr. Yavuz in the property made the subject of this action. [Defendant] was not obligated to take any additional action to quiet the title of the Plaintiff in relation to the claims of Mr. Yavuz.

On appeal, Plaintiff argues the trial court erred in concluding the title insurance policy did not impose an affirmative duty on Defen-

---

**2.** Defendant also, filed a third-party petition against Seller alleging Seller owed Plaintiff a duty to defend the title because the subject property was conveyed by Seller to Plaintiff via warranty deed. Seller then filed its own third-party petition against Kenneth M. Smith and Riggs, Abney, Neal, Turpen, Orbison & Lewis, Inc. claiming tortious interference with contract. Seller alleged Kenneth M. Smith drafted a letter on his firm's letterhead (Riggs, Abney, Neal, Turpen, Orbison & Lewis, Inc.) which was forwarded to Defendant, putting Defendant on notice of the Yavuz litigation with the intention and result of interfering with Seller's sales and contracts involving other property it owned in the Woodland Valley Office Park. None of the third-party defendants are parties to this appeal.

dant to confirm Plaintiff's title. Additionally, Plaintiff challenges the trial court's finding the expungement of the *lis pendens* notices eliminated any cloud on Plaintiff's title considering the continuing nature of the Yavuz litigation after the closing.

## STANDARD OF REVIEW

¶ 6 Whether the trial court's entry of summary judgment was proper is a question of law we review *de novo*. *See Manley v. Brown*, 1999 OK 79, ¶ 22, 989 P.2d 448, 455. Summary judgment is appropriate where the record establishes no genuine issue of material fact and the prevailing party is entitled to judgment as a matter of law. *Brown v. Alliance Real Estate Group*, 1999 OK 7, ¶ 7, 976 P.2d 1043. Here, the parties agree on the relevant material facts, and the only question before us is whether paragraph 4(b) imposes a duty on a title insurer to take affirmative action to confirm an insured's title.

## NATURE OF TITLE INSURANCE

¶ 7 Title insurance is "ordinarily considered a contract of indemnity." Steven Plitt *et al.*, 11 COUCH ON INSURANCE § 159:8 (3d.2013). "The importance of the contract not being one of guaranty is primarily that the insurer's liability to pay monetary compensation under the policy does not arise immediately upon the existence of a covered defect being proved." *Id.* at § 159:9. Rather, the insurer has "a range of options by which it may fulfill its obligations under the policy" including "paying the amount of the insured's loss, paying the face amount of the policy . . ., successfully defending the insured against an adverse claim, instituting affirmative litigation to clear the title" or settling with adverse title claimants. *Id.* The unique nature of title insurance makes it somewhat

different from other breach of contract disputes.[3]

## INSURER'S "RIGHT" TO TAKE AFFIRMATIVE ACTION

¶ 8 The relevant policy provisions come from a standard American Land Title Association ("ALTA") policy. Paragraph 4(a) provides in pertinent part:

> Upon written request by the insured and subject to the options contained in Section 6 of these Conditions and Stipulations,[4] the Company, at its own cost and without unreasonable delay, shall provide for the defense of an insured in litigation in which any third party asserts a claim adverse to the title or interest as insured, but only as to those stated causes of action alleging a defect, lien or encumbrance or other matter insured against by this policy.

Paragraph 4(b) states:

> The Company shall have the right, at its own cost, to institute and prosecute any action or proceeding or to do any other act which in its opinion may be necessary or desirable to establish the title to the estate or interest, as insured, or to prevent or reduce loss or damage to the insured. The Company may take any appropriate action under the terms of this policy, whether or not it shall be liable thereunder, and shall not thereby concede liability or waive any provision of this policy. If the Company shall exercise its rights under this paragraph, it shall do so diligently.

Plaintiff framed the issue on appeal as being whether paragraph 4(b) imposes a duty on Defendant to take affirmative action to confirm Plaintiff's title. While many jurisdictions have analyzed the same uniform policy language, Oklahoma has not. Thus, this is a question of first impression in this jurisdiction.

---

3. To recover under a claim for breach of contract in Oklahoma, a plaintiff must show: 1) formation of a contract; 2) breach of the contract; and 3) damages as a direct result of the breach. *E.g. Digital Design Group, Inc. v. Information Builders, Inc.*, 2001 OK 21, 33, 24 P.3d 834.

4. Section 6 provides the insurer with options to perform under the policy including tendering the policy limits along with any costs of litigation

incurred by the insured claimant which were authorized by the insurer. Section 6 also provides "[i]n the event of litigation, including litigation by the Company or with the Company's consent, the Company shall have no liability for loss or damage until there has been a final determination by a court of competent jurisdiction, and disposition of all appeals therefrom, adverse to the title as insured."

¶ 9 "Oklahoma law governing insurance coverage disputes is well-established. The foremost principle is that an insurance policy is a contract." *Cranfill v. Aetna Life Ins. Co.*, 2002 OK 26, ¶ 5, 49 P.3d 703. "Parties may contract for risk coverage and will be bound by policy terms. When policy provisions are unambiguous and clear, the employed language is accorded its ordinary, plain meaning, and the contract is enforced carrying out the parties' intentions. The policy is read as a whole, giving the words and terms their ordinary meaning, enforcing each part thereof. This Court may not rewrite an insurance contract to benefit either party.... We will not impose coverage where the policy language clearly does not intend that a particular individual or risk should be covered." *BP America, Inc. v. State Auto Property and Casualty Ins. Co.*, 2005 OK 65, ¶ 6, 148 P.3d 832. (Footnotes omitted). "The interpretation of an insurance contract and whether it is ambiguous is a matter of law that will be resolved by the court." *Redcorn v. State Farm Fire & Casualty Co.*, 2002 OK 15, ¶ 4, 55 P.3d 1017. (Internal citation omitted). "An insurance contract is ambiguous only if it is susceptible to two constructions on its face from the standpoint of a reasonably prudent layperson, not from that of a lawyer." *Haworth v. Jantzen*, 2006 OK 35, ¶ 13, 172 P.3d 193. This Court will not indulge in strained interpretations to create such an ambiguity. *Id.*

¶ 10 Plaintiff has not argued the policy language is ambiguous in any way, and the plain language of paragraph 4(b) clearly states Defendant shall have the "right" to take whatever action "in its opinion may be necessary or desirable to establish the title." The policy language does not impose a duty on the insurer to take affirmative action to confirm the insured's title. Rather, such affirmative action is an option the insurer may exercise should it so choose.[5] In addition to the plain language of the policy and decisions from other jurisdictions,[6] this conclusion is supported by numerous commentaries on the subject. *E.g.* Joyce D. Palomar, 1 TITLE INSURANCE LAW § 11:11 (2013–2014); Steven Plitt *et al.*, 11 Couch on Insurance § 159:9 (3d.2013). As summarized in a recent decision from the U.S. District Court for the District of Colorado analyzing the same policy language at issue here:

> Paragraph 4(b) does not place an independent duty to act on [the insurer]; rather, the paragraph mentions only [the insurer's] rights under the policy and [the insurer's] option to take whatever action it deems necessary. If the provision cited by [the insured] created as broad a duty as [the insured] argues, Paragraph 4(b) would have been drafted differently to capture the reasonable expectations of the insured, such as providing that [the insurer] "shall institute" a defense of the insured ... or that [the insurer has] "the obligation to institute" action to clear title. Paragraph 4(b) contains no such mandatory language. Moreover, the policy must be interpreted as a whole. Were [the insurer] under the same obligation to defend the insured and unilaterally cure title defects, the differences between the language of paragraph 4(a) and paragraph 4(b) would be left

---

5. As Professor Palomar has noted, "[t]he unspoken qualification [with the insurer having the option to take affirmative action] is that the insurer must consider such affirmative action to be both necessary and wise. The title insurer is unwilling to subject itself and its capital to an insured's judgment as to when an affirmative act is required." Joyce D. Palomar, 1 TITLE INSURANCE LAW § 11:1 (2013–2014).

6. In addition to the Northern District of Colorado, other jurisdictions have also examined ALTA title insurance policy provisions and concluded the language does not impose a duty on the insurer to take affirmative action to confirm the insured's title. *E.g. Willow Ridge Ltd. Partnership v. Stewart Title Guaranty Co.*, 706 F.Supp. 477 (S.D.Miss.1988) (holding that "[w]hile a suit

to clear title was an option available to [the insurer], it was an option and nothing more than that."); *Securities Service, Inc. v. Transamerica Title Ins. Co.*, 20 Wash.App. 664, 583 P.2d 1217 (1978) (finding the plain language of the policy prohibited the court from "rewrit[ing] the insurance contract so as to impose a broader duty to 'clear title' ") (rejected on other grounds by *Hartman v. Shambaugh*, 96 N.M. 359, 630 P.2d 758 (1981); *Childs v. Mississippi Valley Title Ins. Co.*, 359 So.2d 1146 (Ala.1978)) (declining to find an affirmative duty to clear title and distinguishing *Jarchow v. Transamerica Title Ins. Co.*, 48 Cal. App.3d 917, 122 Cal.Rptr. 470 (1975) based on the differences between the *Jarchow* policy language and uniform ALTA policy language).

unexplained. *U.S. Bank N.A. v. Stewart Title Guaranty Co.,* No. 13–CV–00117, 2014 WL 1096961, at *9 (D.Colo. March 20, 2014).

¶ 11 In support of its argument, Plaintiff cited three cases, *Davis v. Stewart Title Guaranty Co.,* 726 S.W.2d 839 (Mo.App. 1987); *Summonte v. First American Title Ins. Co.,* 180 N.J.Super. 605, 436 A.2d 110 (1981); and *Jarchow v. Transamerica Title Ins. Co.,* 48 Cal.App.3d 917, 122 Cal.Rptr. 470 (App.1975) (overruled on other grounds by *Soto v. Royal Globe Ins. Corp.,* 184 Cal. App.3d 420, 229 Cal.Rptr. 192 (App.1986)). These cases are distinguishable from the instant case.[7] First, *Jarchow* interpreted different policy provisions than those at issue here.[8] The provisions at issue in that case provided:

> The [Title] Company, at its own cost and without undue delay *shall provide* (1) for the defense of the insured in all litigation consisting of actions ... commenced against the insured ...; *or* (2) for such actions as may be appropriate to establish the title ... as insured, which litigation ... is founded upon an alleged defect, lien or encumbrance insured against by this policy...."

*Jarchow,* 48 Cal.App.3d 917, 122 Cal.Rptr. 470, 487. (Emphasis added.) The California appellate court found those provisions established two obligations of the insurer:

(1) to defend the insured's title if a third party claims, in a judicial proceeding, an interest insured against by the policy, and (2) in the event that a third-party claimant chooses not to litigate his claim, to take affirmative action (by filing an action to quiet title or by offering to compromise the third party's claim) ... *Id.*[9]

We note the *Jarchow* policy provisions included mandatory "shall" language before both obligations as the two courses of action were connected with the disjunctive conjunction "or." *Id.* While the word "shall" is used in paragraph 4(b) of the ALTA policy at issue here, the terms "right" and "in its option" included in that paragraph modify the action into options the Defendant could take if it so chose. In contrast, paragraph 4(a) of the ALTA policy indicates Defendant "shall provide" a defense for Plaintiff if a third party brings a claim adverse to Plaintiff's title. The directive does not include any qualifying or limiting language. "Were [Defendant] under the same obligation to defend the insured and unilaterally cure title defects, the differences between the language in paragraph 4(a) and paragraph 4(b) would be left unexplained." *U.S. Bank N.A. v. Stewart Title Guaranty Co.,* 2014 WL 1096961, at *9.

¶ 12 The *Summonte* court interpreted policy language nearly identical to the policy language at issue here. *Summonte,* 180 N.J.Super. 605, 436 A.2d 110, 115. The court noted the policy language in paragraph 4(b)

7. In addition to the discussion below distinguishing these cases, we note that the court in each case seemed to focus on the insurer's "complete denial of liability or other failure to respond to the insured's claim." 1 Title Ins. Law § 11:11 (internal citations omitted).

8. *Jarchow* interpreted language from a California Land Title Association ("CLTA") form policy.

9. Even after holding the policy language at issue imposed a duty on the insured to take affirmative action, the *Jarchow* court noted:

> It is an oversimplification to assert that the duties to defend and to quiet title are precisely equivalent. The duty to defend arises only after a third-party claimant has filed an action against the insured; in such circumstances it is plain that the insured's title is subject to a real cloud. However, the kindred duty to quiet title does not, and should not, arise in every situa-

tion in which the insured requests his insurer to act: there must be present in the facts and circumstances of the case some indicia that the encumbrance with which the policy holder is concerned is a genuine cloud upon his title. Note, however, that should the insurer decide that the alleged cloud is illusory, it must bear the risk of its decision, and may, subsequently, be found to have acted in bad faith. *Jarchow,* 122 Cal.Rptr. at 488, n. 18.

It is also worth noting that the insured in *Jarchow* had no other remedy available other than to sue the insurer demanding it take affirmative action. "The claimant of the easement [adverse title interest] in *Jarchow* would never have initiated legal action which could have evoked the insurer's duty to defend because the plaintiff had persuaded local planning commissioners to restrict the insured's development of the land in a way that assured he could continue to use the portion of land allegedly encumbered by the easement." 1 Title Ins. Law § 11:11.

seemed to require the insurer "to establish title only at its option." *Id.* However, the court found:

> When liberal and obligatory rules of construction are applied, the reading is different ... and require[s] a construction of the policy in favor of the insured and one which ... will give the insured the protection which he reasonably had a right to expect. This requires paragraphs [4(a) and 4(b) ] ... to be read together so that the right to establish the title is a mandatory alternative to the obligation to defend. *Id.* (Internal quotations and citations omitted).

The analysis employed by the *Summonte* court is contra to Oklahoma law.[10] In Oklahoma, insurance policies, like all other contracts, are enforced according to the express agreement of the parties, absent ambiguity." *BP America, Inc.*, 2005 OK 65, ¶ 6, 148 P.3d 832. *See also Max True Plastering Co. v. U.S. Fidelity and Guaranty Co.*, 1996 OK 28, 912 P.2d 861.[11] Here, the terms of the policy are not ambiguous and clearly establish Defendant has the right, but not the duty, to take whatever affirmative action it may deem necessary to establish Plaintiff's title.

10. *Summonte* also presented unique factual circumstances which limited the insured's options under the contract. *See* note 7, *supra.* In that case, the insured requested the insurer remove a judgment lien, which the insurer negligently failed to discover and disclose, pursuant to the title insurance policy. *Summonte*, 180 N.J.Super. 605, 436 A.2d 110, 111. Not only did the insurer refuse to take action to remove the lien, but, contrary to the interests of its insured, acquired the lien by a recorded assignment. *Id.* at 110. The insured was left without recourse under the contract because the insurer was both lien holder and insurer. The insured could not voluntarily pay the judgment as settlement was prohibited without the insurer's consent, and the insured could not demand the insurer defend title as there was no litigation to defend at that point. *Id.* at 116. The *Summonte* court noted that, because the insurer owned the lien, principles of equity mandated it remove the lien rather than requiring the insured to pay the amount due to the insurer only to have the insurer reimburse the insured. *Id.* at 116.

11. In *Max True*, the Oklahoma Supreme Court, in response to a certified question from the U.S. District Court for the Northern District of Oklahoma, specifically adopted the "reasonable expectations doctrine" in the interpretation of

¶ 13 Plaintiff also relied heavily on *Davis v. Stewart Title Guaranty Co.*, 726 S.W.2d 839 (Mo.Ct.App.1987) to support its claim Defendant had a duty to take affirmative action.[12] The *Davis* court, citing specific policy provisions at issue there, found the insurer had two alternatives "when presented with a claim of an adverse interest to an insured property: (1) to pursue a quiet title action *without unreasonable delay;* or (2) to pay damages within thirty days after determination." *Davis*, 726 S.W.2d at 845 (emphasis original) (footnotes omitted). The court further concluded the claim was presented to the insurer when the plaintiff first requested the insurer to take affirmative action to clear its title before plaintiff ever pursued litigation on its own. *Id.* at 853. First, we note we do not have all of the relevant policy language from *Davis* necessary to compare it to the ALTA policy language at issue here. The *Davis* policy language appears to be substantially similar, *see Davis*, 726 S.W.2d at 845, n. 2, but without all the relevant portions available for comparison, we decline to blindly follow the holding in *Davis*. Second, we recognize the insurer in *Davis* completely denied liability under the policy even after the insured brought its own unsuccess-

insurance contracts, stating, "the reasonable expectations doctrine may be applied in the construction of insurance contracts and that the doctrine may apply to ambiguous contract language or to exclusions which are masked by technical or obscure language or which are hidden in a policy's provisions." *Max True*, 1996 OK 28, ¶ 24, 912 P.2d 861. "Under the doctrine, if the insurer or its agent creates a reasonable expectation of coverage in the insured which is not supported by policy language, the expectation will prevail over the language of the policy." *Id.* at ¶ 8. There is no indication from the record Defendant or any of its agents created an expectation Defendant would pursue affirmative action to confirm Plaintiff's title. The plain language of the policy prevails, and Defendant has no duty to take such affirmative action.

12. The plaintiff in *Davis* discovered a neighboring church had a recorded easement which gave it rights to use part of plaintiff's lot for parking. *Davis*, 726 S.W.2d at 842. Such easement had not been disclosed on plaintiff's title opinion, and the title insurer did not except it from coverage. *Id.* Plaintiff tried to sell the lot to the church for parking purposes, but the church declined citing its recorded easement and current enjoyment of parking rights. *Id.*

ful unlawful detainer action against the adverse claimant.[13]  *Id.* at 843. The insurer refused to participate in any appeal from the unlawful detainer suit, refused to tender the policy limits, and only filed a quiet title action after being sued by its insured.[14]

¶ 14 Unlike the insurer in *Davis*, Defendant here had not refused to take any action while also denying it was liable under the policy at all. Rather, Defendant, while recognizing its option to pursue affirmative action, chose to wait until the conclusion of the Yavuz litigation. This course of action was permitted by the policy, which stated, in the event of litigation, Defendant's liability under the policy did not arise until "there ha[d] been a final determination by a court of competent jurisdiction, and disposition of all appeals therefrom, adverse to the title as insured." [15] This course of action was also supported by the fact title insurance is a policy of indemnity, not guaranty, which gives the insurer options other than to pay upon the showing of an adverse claim insured by the policy. *See George K. Baum Properties, Inc. v. Columbian Nat'l Title Ins. Co.,* 763 S.W.2d 194, 200–02 (Mo.Ct.App.1988) (reversing and remanding suit brought for breach of title insurance policy when jury instructions indicated the only option insurer had when presented with an adverse claim was to tender the policy limits).[16]

¶ 15 We hold, therefore, under the particular facts and circumstances presented by this case, the uniform ALTA policy language, specifically paragraph 4(b), does not impose a duty on the insurer to take affirmative action to confirm the title of an insured. Because we find Defendant did not have a duty to take such affirmative action, the effect of the expungement of the *lis pendens* notices is irrelevant. Even if the expungement failed to eliminate any cloud on the title created by the Yavuz litigation, the insurer still was not under a duty to take affirmative action and would not have been required to perform under the policy, if at all, until the conclusion of the Yavuz litigation.

¶ 16 As explained herein, the order granting summary judgment to Defendant is AFFIRMED.

BELL, P.J., and GOREE, J., concur.

---

13. We also note the plaintiff in *Davis* requested permission from the insurer to pursue a quiet title action on its own with the insurer paying the attorneys fees and costs under its policy of indemnity. *Davis,* 726 S.W.2d at 843. The insurer refused to give its permission. *Id.* Like the plaintiffs in *Jarchow* and *Summonte, supra,* the plaintiff in *Davis* was also left without any recourse. The church would never have brought its own litigation to assert its easement because it was already enjoying the rights guaranteed by such easement. Thus, the insurer's duty to defend the plaintiff in litigation would never arise. The insurer also refused to take affirmative action to stop the church's enjoyment of the easement and refused to give plaintiff its permission to pursue litigation on its own, as required by the policy. The *Davis* plaintiff had no choice but to bring an action against the adverse claimant on its own, and then sue its insurer to perform under the policy.

14.  In addition to a breach of contract claim, the plaintiff in *Davis* brought a claim for "vexatious refusal to pay," which is a statutory claim available under Missouri law.

15. The current status of the Yavuz litigation is unclear from the record. However, it is clear the Yavuz litigation continued throughout a significant portion of the proceedings at the district court level.

16. The insurer in *George K. Baum* did not totally deny liability as the insurer in *Davis* did. Rather, it opted to wait to pursue affirmative action until after the conclusion of a hearing to rezone the subject property. *George K. Baum,* 763 S.W.2d at 201. The title opinion had not disclosed a restrictive covenant which the insured wanted removed. *Id.* However, it was the insurer's opinion that, unless the subject property was successfully rezoned, the restrictive covenant would not prohibit the insured's planned development. *Id.* at 198–99. Additionally, the insurer felt damages could not be determined unless and until the rezoning process was completed. *Id.* at 201. The decision of the insurer in *George K. Baum* is similar to the choice of Defendant in the present case to wait until the conclusion of the Yavuz litigation before taking any affirmative action or otherwise performing under the policy.