

# IN THE MISSOURI COURT OF APPEALS
# WESTERN DISTRICT

PEDRO CARRILLO, )
)
Respondent, )
)
v. ) WD86862
)
MISSOURI DEPARTMENT OF ) Opinion filed: April 29, 2025
CORRECTIONS, )
)
Appellant. )

**APPEAL FROM THE CIRCUIT COURT OF
JACKSON COUNTY, MISSOURI
THE HONORABLE CHARLES H. MCKENZIE, JUDGE**

Before Special Division:  Cynthia L. Martin, Presiding Judge,
W. Douglas Thomson, Judge and Joseph M. Ellis, Special Judge

The Missouri Department of Corrections (the "DOC") appeals the trial court's judgment following a jury verdict in favor of Pedro Carrillo ("Carrillo") on his claims of disability discrimination and hostile work environment under the Missouri Human Rights Act ("MHRA"), section 213.010 *et seq.*[1]  The DOC raises three Points on Appeal, all of which concern Carrillo's claim of disability

---

[1] All statutory references, including references to chapter 213, are to RSMo (2017), unless otherwise stated.  The MHRA was amended, effective August 28, 2017.  This case is governed by the post-amendment statute.

discrimination.[2]  Because any error asserted by the DOC cannot be prejudicial error requiring reversal, we affirm.  On remand, we direct the trial court to determine the amount of appellate attorney fees, post-judgment interest on same, and expenses to be awarded Carrillo.

**Factual and Procedural History**

Carrillo began his career with the DOC in June of 2014 as a Corrections Officer I ("CO-I") at the Western Missouri Correctional Facility in Cameron, Missouri.  At the start of his employment, discussions took place concerning the fact that he had congestive heart failure and a pacemaker.  Because of his pacemaker, Carrillo obtained a letter from the chief of custody that allowed him to bypass the metal detectors when entering and exiting the facility and instead be pat-searched and "wand[ed] over with a wanding device[.]"

In 2015, Carrillo transferred to the Kansas City Reentry Center ("KCRC"), a smaller Division of Adult Institutions ("DAI") facility.  Carrillo started off at KCRC as a CO-I, but was promoted to a Corrections Officer II ("CO-II") in 2016.  While at KCRC, Carrillo again received permission to be pat-searched and "wanded" instead of walking through the metal detector when entering the facility.  This was reiterated in January of 2017 when a new warden ("Warden 1")[3] transitioned into KCRC and informed custody staff of Carrillo's exception to the metal detectors.

---

[2] The DOC does not appeal the judgment entered in favor of Carrillo on his hostile work environment claim.

[3] Pursuant to section 509.520.1(5), RSMo (2023), we do not provide the names of any non-party witnesses in this opinion.

On July 1, 2017, the DOC's Policy D2-11.4 went into effect. This is the DOC's "zero tolerance policy" regarding discrimination, harassment, retaliation, and unprofessional conduct. Under the policy, staff members who experience or witness any form of discrimination, harassment, retaliation, or unprofessional conduct are required to immediately report the conduct. Similarly, supervisors who experience, witness, or receive reports of such conduct are required to report it to their chief administrative officer, and such reports are to be automatically sent to the Office of Professional Standards ("OPS") in Jefferson City, Missouri. Supervisors who receive such reports are to prepare and send a Request for Investigation to OPS for review.

Between 2015 and 2017, no one at KCRC gave Carrillo any trouble with respect to bypassing the metal detectors. This changed in 2017 when Carrillo began having daily interactions with D.P., a supervisor over maintenance.[4] Carrillo's problems with D.P. began "[a]lmost immediately." When Carrillo would bypass the metal detectors, D.P. would "immediately" say "why are you getting different treatment? Why are you being treated special? Why do you not have to go through this metal detector like everybody else? Why aren't you like anybody else?" D.P. would make it "a huge production[.]" He would call Carrillo names and tell Carrillo he did not "feel safe" with Carrillo there because "I don't know that you're not bringing stuff into the institution" and "if you have a medical condition I don't feel safe, you know, that you're not able to come through or do your job."

---

[4] D.P. was not Carrillo's supervisor nor was he in Carrillo's chain of command.

D.P. was "irate" and "very indignant about it." He would scream and curse loud enough where "[e]verybody could hear" and "he'd make sure that he caused enough ruckus that everybody heard it." This occurred "every single time" Carrillo and D.P. went through the metal detector area together.

Carrillo "[i]mmediately" started to complain about D.P., going first to his direct supervisor. D.P.'s complaints were also presented to the then-special assistant to the Director of DAI and Warden 1. Warden 1 spoke to D.P., telling him Carrillo did not have to go through the metal detectors. However, Warden 1 never sent a Request for Investigation to OPS in Jefferson City regarding Carrillo's complaints about D.P. Carrillo stated D.P.'s behavior did not stop.

In September of 2017, Carrillo was assigned the joint position of chief training officer/fire and safety specialist ("CTO/F&S") in an acting capacity. Carrillo was excited, as being the training officer was his "dream job." Carrillo served in the acting capacity position for 355 consecutive days. During that time, Carrillo received "accolades" and was told he was "doing a really good job," "turning the place around," and "pushing training." While in the acting CTO/F&S role, Carrillo's supervisor was S.C., the deputy warden of operations.

In July of 2018, Carrillo underwent surgery to replace his pacemaker. Beforehand, Carrillo informed S.C. of the procedure and told him he was going to be off work for a week. Carrillo had also scheduled a mass casualty, crisis management tabletop for August of 2018, which would be attended by the department heads, function unit managers, case managers, wardens, chief of

4

custody, and lieutenants. Some of the function unit managers ultimately had a conflict and requested that the meeting be rescheduled. Carrillo, who had returned early from medical leave due to the meeting, agreed to push the meeting back.

S.C. apparently "didn't like that" and started "talking about [Carrillo's] pacemaker," stating "if [Carrillo] hadn't taken the time off or had any medical procedure, we wouldn't have to push this – if he was better prepared, we wouldn't have to push this meeting back."[5] S.C. made these statements to "the head nurse" and in front of a few others. Carrillo subsequently informed the warden at that time ("Warden 2") of the incident in an August 9, 2018 interoffice communication memo. While Carrillo did not receive a response to his memo from Warden 2, Warden 2 spoke with S.C. concerning "what he's . . . saying about people around other staff members."

In September 2018, Warden 2 removed Carrillo from his acting role as acting CTO/F&S. The reason provided to Carrillo was that he had been in the "acting" position too long and they were thus "out of policy," meaning they were in noncompliance with the acting capacity policy, which established the guidelines for placing employees in such assignments with or without additional pay. While Carrillo was in the acting capacity assignment, he was paid as a CO-II sergeant. Carrillo was never paid for the additional work he performed while in the acting

---

[5] The evidence was unclear as to the exact contents of S.C.'s statements.

capacity assignment, despite efforts by Warden 2 to request such compensation for him.[6]

In November of 2018, Carrillo filed a Charge of Discrimination with the Missouri Commission on Human Rights. After receiving Carrillo's Charge of Discrimination on December 3, 2018, Warden 2 submitted a Request for Investigation to OPS on December 4th concerning the allegations contained in Carrillo's charge.

Shortly thereafter on December 19, 2018, Carrillo interviewed for the full-time CTO/F&S position. This was Carrillo's third attempt at securing the position, having previously interviewed for it in October of 2017 and October of 2018. The first time Carrillo had interviewed, he was told he was recommended for the position, but was subsequently informed that he did not meet the minimum qualifications for the position.[7] Ultimately, no one was placed in the formal CTO/F&S position following the round of interviews in October of 2017. When he interviewed again in October of 2018, the position was again not filled.

Following the December 19, 2018 interviews, Carrillo was recommended for the position. The recommendation was approved by Warden 2, who then forwarded the recommendation to the deputy division director for DAI in January

---

[6] This request was denied by the Director of DAI because the DOC's policy had not been followed, and pursuant to such policy Carrillo "didn't qualify for the position which is required for acting capacity with pay."

[7] Carrillo had also interviewed for an open Corrections Officer III ("CO-III") lieutenant position in October of 2017. Carrillo was awarded the position, but ultimately turned it down in favor of staying in the acting capacity position so he could eventually meet the minimum qualifications needed for the full-time CTO/F&S position.

of 2019. On February 4, 2019, Carrillo's appointment was approved for a predominately F&S position that also entailed CTO duties. However, on February 3, 2019, Carrillo had submitted a letter of resignation to his direct supervisor. He "finally had enough" and "was done because of the way [he] was being treated." Carrillo's direct supervisor learned of the resignation the following day, at which time she signed off on it. On February 5th, S.C. called Carrillo to offer him the position. Carrillo "informed [S.C.] that it was his dream job, but he would have to respectfully decline because he felt like he would lose face in front of other staff members." Carrillo had reached his "limitation" and "didn't want it to be like a power play" of "I'm going to quit if you don't promote me[.]" Warden 2 accepted Carrillo's resignation in good standing the next day. Carrillo's final day of employment with the DOC was February 17, 2019.

Carrillo filed his original petition for damages against the DOC on August 4, 2019. On June 3, 2020, he filed his Second Amended Petition. The Second Amended Petition alleged six counts. The petition alleged the DOC had discriminated against Carrillo on the basis of disability, race, gender, and national origin; that the DOC retaliated against him for his complaints of discrimination and harassment; and that he was subjected to unwelcome harassment and discrimination based on his national origin, gender, disability, and race, such that it created a hostile work environment.

The case proceeded to a five-day jury trial on July 10, 2023. At the conclusion of the evidence, Carrillo's claims of national origin discrimination,

7

disability discrimination, hostile work environment, and retaliation were submitted to the jury. These multiple theories were each submitted using a separate verdict director, but were then collectively submitted using a single verdict form, Verdict A, without objection. In Verdict A, the jury noted that they had reached verdicts in favor of the DOC on the national origin discrimination and retaliation claims, and that they had reached verdicts in favor of Carrillo on his claims of disability discrimination and hostile work environment. Verdict A then directed the jury to calculate a single damage award, collectively applicable for the claims as to which they had reached verdicts in favor of Carrillo. The jury awarded Carrillo $12,000 in back pay, $12,500 for past economic losses excluding back pay, and $114,000 for non-economic losses. The jury found the DOC was not liable for punitive damages.

On July 19, 2023, the trial court entered its judgment against the DOC and in favor of Carrillo on his two claims in the amount of $138,500 in compensatory damages. Thereafter, on August 15, 2023, Carrillo filed a motion for attorneys' fees, costs, and post-judgment interest. The trial court entered an "Amended and Final Judgment" on October 4, 2023, which granted Carrillo's motion. Accordingly, the amended judgment included an award of attorney's fees in favor of Carrillo's counsel along with the same compensatory damages as stated in the July 19, 2023 judgment, and further stated that the "Judgment shall bear interest pursuant to § 408.040.3 RSMo at a rate of 10.50% from this date forward (the current Federal Reserve Rate of 5.50% plus 5%)." Subsequently, the DOC filed a

8

motion for judgment notwithstanding the verdict ("JNOV") or in the alternative for a new trial on November 3, 2023, which was denied by the trial court on December 28, 2023.

The DOC appeals.[8]

---

[8] Carrillo filed a motion to dismiss this appeal as untimely, which was taken with the case. Therein, Carrillo argues that the DOC failed to file a timely authorized after-trial motion following the trial court's original July 19, 2023 judgment, and consequently also failed to timely file its Notice of Appeal. Central to Carrillo's argument is his assertion that neither his post-trial motion for attorneys' fees filed on August 15, 2023 nor the trial court's October 4, 2023 amended judgment altered the finality of the original July 19, 2023 judgment, because his post-trial motion was filed pursuant to Rule 74.16, which provides that a motion for attorney fees filed thereunder "is an independent action and not an authorized after-trial motion . . . ." Rule 74.16(b)(3). All rule references are to Missouri Supreme Court Rules (2024).

Carrillo is correct in his analysis of Rule 74.16 as it pertains to a motion for attorney fees filed after entry of judgment. *See generally Wiseman v. Mo. Dep't of Corr.*, No. WD86412, 2025 WL 898740 (Mo. App. W.D. Mar. 25, 2025) (this case remains subject to motion for rehearing or transfer). However, Carrillo overlooks the fact that his post-trial motion *also requested* the judgment state "post-judgment interest of 10.33% per annum on the unpaid balance of the Judgment until the Judgment is fully satisfied." Significantly, the trial court's July 19, 2023 judgment did *not* include an award of post-judgment interest together with the applicable interest rate, even though it was statutorily required. *See Wiedner v. Ferrellgas, Inc.*, 662 S.W.3d 842, 849 (Mo. App. W.D. 2023) (discussing section 408.040, "[t]he cumulative impact of these provisions required that the trial court's judgment [in a tort case] include an award of post-judgment interest together with the applicable interest rate."). "Even though mandated by statute, the award of post-judgment interest must be included in the original [final] judgment to which it applies or in a timely amendment to that judgment." *SKMDV Holdings, Inc. v. Green Jacobson, P.C.*, 494 S.W.3d 537, 561 (Mo. App. E.D. 2016) (citing *Peterson v. Discover Prop. & Cas. Ins. Co.*, 460 S.W.3d 393, 413 (Mo. App. W.D. 2015)). Failure to include the statutorily required post-judgment interest award in a judgment entered in a tort case does not impact the finality of the judgment, and instead, the right to a post-judgment interest award is waived if not included in the original final judgment or raised in a timely filed motion to amend the judgment. *Id.* at 561-63; *Peterson*, 460 S.W.3d at 413 (holding that right to recover statutory post-judgment interest on a tort judgment is waived if not included in original judgment or timely sought pursuant to a Rule 78.07 motion or pursuant to Rule 75.01).

Accordingly, while Carrillo's post-trial motion included a request for attorney fees that is to be considered an independent action under Rule 74.16, the motion will also be treated as a timely authorized after-trial motion to amend the original final judgment to include the statutorily required post-judgment interest. *See* Rule 78.04. Consequently,

9

## Analysis

The DOC raises three Points on Appeal. In Point I, the DOC claims the trial court erred in denying the DOC judgment notwithstanding the verdict on Carrillo's disability discrimination claim because Carrillo failed to present a submissible case of such discrimination, "in that no evidence showed a tangible adverse action affecting a term, condition, or privilege of Carrillo's employment." In Points II and III, the DOC argues the trial court erred in submitting subparagraphs two and three of Paragraph Third of Instruction 11, the verdict director for Carrillo's disability discrimination claim. Point II asserts that "those subparagraphs constituted improper duplication that violated Rule 70.02, in that Instruction No. 11 misdirected, misled, or confused the jury, resulting in prejudice to [the DOC], where the hostile work environment verdict director (Instruction No. 13) submitted the same verbal harassment as Paragraph Third of Instruction No. 11." Point III contends Instruction 11 misstated the law, resulting in prejudice to the

---

the trial court's October 4, 2023 amended judgment adding the statutorily required interest rate was timely ruled and became "a new judgment for all purposes." Rule 78.07(d); *see also Southside Ventures, LLC v. La Crosse Lumber Co.*, 574 S.W.3d 771, 788 (Mo. App. W.D. 2019) (holding that authorized amended judgment shall be deemed a new judgment for all purposes as contemplated by Rule 78.07(d), which includes the time from which a party can file an authorized post-trial motion from the amended judgment) (citation omitted)). Though the DOC could have timely filed a motion for JNOV and new trial after the original judgment was entered, its failure to do so does not alter the fact that the DOC's subsequent motion for JNOV and new trial were timely filed after the amended judgment was entered. The DOC's Notice of Appeal was thus timely filed following the trial court's denial of said motion. We therefore deny Carrillo's motion to dismiss the appeal, and dispense with any similar argument of untimeliness asserted in his brief.

10

DOC, in that Instruction 11 misdirected or misled the jury by submitting in said subparagraphs verbal comments that were not adverse employment actions.

As can be seen, all three of the DOC's Points on Appeal relate to the disability discrimination claim. However, disability discrimination was but one of two theories of recovery found in Carrillo's favor by the jury, the other being hostile work environment. This is reflected in Verdict A, as is the jury's award of damages to Carrillo. Importantly, Verdict A directed the jury to award damages to Carrillo if it found in his favor on "one or more" of the four theories of recovery submitted. In other words, Verdict A provided a single compensatory damage award for multiple theories of liability. *See Eivins v. Mo. Dep't of Corr.*, 636 S.W.3d 155, 178-79 (Mo. App. W.D. 2021) ("A party may pursue multiple theories of liability, but cannot recover duplicative damages for the same wrong. While a double recovery for the same wrong is deemed an impermissible windfall, a party may be made whole by one compensatory damage award for multiple theories." (citations omitted)) (applying this principle to claims brought under the MHRA).

At no time did the DOC object to Verdict A. In fact, counsel for the DOC explicitly stated he had "[n]o" objection to the verdict form. By failing to object to Verdict A, the DOC "waived any objection it might have had to submitting multiple theories under a single verdict form." *HHS Tech. Grp. Holdings, LLC v. State*, 707 S.W.3d 788, 797 (Mo. App. W.D. 2025). Indeed, "'[a] challenge to the propriety of the form of verdict . . . [i]s due and preserved only by a contemporaneous objection.'" *Id.* (omission and second alteration in original) (quoting *Davis v.*

11

*Stewart Title Guar. Co.*, 726 S.W.2d 839, 857 (Mo. App. W.D. 1987)) (also citing *Lindsey Masonry Co. v. Jenkins & Assocs., Inc.*, 897 S.W.2d 6, 10 (Mo. App. W.D. 1995)).

Therefore, in order to prevail on its appeal, the DOC must demonstrate that *both* the disability discrimination claim and the hostile work environment claim and instructions were in error, as the single damage award entered on Verdict A applied to either claim, regardless a finding of liability on the other. *See e.g., id.* (collecting cases in finding that appellant would have to demonstrate invalidity of two theories of recovery where both were submitted in single verdict form); *Mathes v. Sher Express, L.L.C.*, 200 S.W.3d 97, 107 (Mo. App. W.D. 2006) (noting that a single verdict form used to submit multiple theories of liability "would also have the potentially salutary purpose of avoiding a retrial in the event that some error or insufficiency of evidence was found in only one of the verdict directing theories"). However, the DOC appeals only *one* of the theories of liability entered against it. Thus, were the DOC to succeed on its appeal, the verdict remains intact because it was *also* rendered with regard to the hostile work environment theory that was *not* appealed. Said another way, the DOC cannot succeed on appeal without prevailing on Points of Appeal defeating *all* the theories of liability upon which the verdict was based, yet they have not challenged one successful theory of liability *at all*. Accordingly, because the DOC has not raised any Point on Appeal challenging the hostile work environment theory, the DOC's appeal cannot succeed.

12

Carrillo prevailed on two theories of liability under the MHRA which resulted in one compensatory damage award in the trial court's judgment. He must only prevail on one theory of liability to support the underlying judgment. Because the DOC has only challenged one of the two theories supporting the judgment, the DOC cannot prevail on appeal because, even if we were to find in favor of the DOC in this appeal, there remains a separate theory of liability supporting the judgment. Accordingly, regardless of what this court may hold with respect to the theory of liability challenged, the judgment survives based on the remaining theory. Thus, any error asserted by the DOC cannot be prejudicial error requiring reversal. The verdict remains intact, regardless of any *one* alleged invalid theory.

## Carrillo's Motion for Attorneys' Fees on Appeal

Prior to submission of this case on appeal, Carrillo filed a motion pursuant to section 213.111.2 and our court's Local Rule 29 seeking an award of his attorneys' fees incurred on post-trial motions and on appeal, his expenses for same, and post-judgment interest on the award of attorneys' fees. In the alternative, Carrillo requests that we remand the case to the trial court for a determination of the amount of attorneys' fees to be awarded. The motion was taken with the case.

The MHRA allows a court to "award court costs and reasonable attorney fees to the prevailing party[.]" Section 213.111.2. "The MHRA's authorization for a prevailing party's attorneys' fees includes appellate attorneys' fees." *Hays v. Dep't of Corr.*, 690 S.W.3d 523, 529 (Mo. App. E.D. 2024) (citing *Soto v. Costco*

*Wholesale Corp.*, 502 S.W.3d 38, 58 (Mo. App. W.D. 2016)). Given that the judgment against the DOC is affirmed on appeal, Carrillo is considered the prevailing party. *See e.g., Walsh v. City of Kansas City*, 481 S.W.3d 97, 115 (Mo. App. W.D. 2016) (noting that a "prevailing party" is "one who prevails in an action brought under the MHRA, is awarded attorney fees by the trial court, and who successfully defends that favorable judgment on appeal" (citations omitted)). Accordingly, we grant Carrillo's motion.

"'Although appellate courts have authority to allow and fix the amount of attorneys' fees on appeal, we exercise this power with caution, believing in most cases that the trial court is better equipped to hear evidence and argument on this issue and determine the reasonableness of the fee requested.'" *Hays*, 690 S.W.3d at 529 (quoting *Soto*, 502 S.W.3d at 58). As such, we remand to the trial court to determine the amount of appellate attorney fees to be awarded to Carrillo, as well as his request for expenses and post-judgment interest.

### Conclusion

For the foregoing reasons, the judgment of the trial court is affirmed. The case is remanded for the sole purpose of determining the amount of appellate attorney fees, expenses, and post-judgment interest on the award of attorneys' fees to be awarded Carrillo.

_____
W. DOUGLAS THOMSON, JUDGE

All concur.